## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

SOMANGSHU MUKHERJI,

     Plaintiff,

v.                                                                   Case No.
                                                                     Hon.

UNIVERSITY OF MICHIGAN
BOARD OF REGENTS;
UNIVERSITY OF MICHIGAN;

     Defendants.

---

Hideaki Sano (P61877)
SALVATORE PRESCOTT
PORTER & PORTER, PLLC
Attorneys for Plaintiff
105 E. Main Street
Northville, MI 48167
(248) 679-8711
sano@sppplaw.com

---

## **COMPLAINT**

    Plaintiff Somangshu Mukherji, by and through his attorneys, SALVATORE

PRESCOTT PORTER & PORTER, in support of his Complaint states the following:

### PARTIES, JURISDICTION AND VENUE

    1.    Plaintiff Somangshu Mukherji is a resident of Ann Arbor, Washtenaw

County, Michigan.

2.     Defendant University of Michigan is a public university (the "University").

3.     Defendant Board of Regents of University of Michigan is the publicly elected body that has general supervision of the University.  The University and its Regents are collectively referred to herein as the "University Parties".

4.     The alleged actions forming the basis of Plaintiff's claims occurred in Washtenaw County, Michigan.

5.     Claims in this action are for discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964.

6.     This Court has subject matter jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331.

**GENERAL ALLEGATIONS**

7.     Professor Mukherji is a music theorist, and was a prominent and well-regarded Assistant Professor in the Music Theory Department of the School of Music, Theory and Dance ("SMTD") at the University of Michigan before his termination by the University.

8.     Professor Mukherji's research explores intersections between disciplines such as Music Theory, Linguistics, and the Cognitive and Computer Sciences.  Among other accomplishments, Professor Mukherji is a Rhodes Scholar, a past Fellow of the American Council of Learned Societies, and past Chair of the

Society for Music Theory's Committee on Race and Ethnicity.  Professor Mukherji completed undergraduate degrees from the University of Oxford and the University of Delhi, and obtained his Master's of Fine Arts and a doctorate from Princeton University.  He also happens to be an immigrant from India.

9.      This case relates to the decision of the Provost of the University to deny Professor Mukherji tenure. As discussed below, the Provost denied Professor Mukherji's tenure case based on an improper substantive review of his tenure casebook and a secret, second tenure review of his tenure case.  Upon information and belief, the improper substantive review and secret second review resulted in Professor Mukherji being subjected to tenure standards that were different and stricter than those that had been applied to the tenure cases of a number of white professors who had been previously granted tenure in the Music Theory department.

10.     The written instruments referenced in this complaint are in the possession of Defendants or otherwise unnecessary to attach as they are readily available to Defendants.

11.     Professor Mukherji joined the Music Theory department faculty at the University in 2013, while completing his doctorate at Princeton University.

12.     Historically, the field of Music Theory has been dominated by white males, but Professor Mukherji has – through his scholarship and other efforts – attempted to help diversity the field and its scholarship.

3

13.     When Professor Mukherji joined the Music Theory faculty, it was in the process of diversifying the racial composition of its faculty.  At the time he joined, there was only one other minority faculty member.  But that faculty member was tenured, had scholarly interests that were similar to Professor Mukherji's interests, and encouraged Professor Mukherji to join the faculty.

14.     When Professor Mukherji began working at SMTD, he became aware that a few of the white, senior faculty members in the Music Theory department held hostility toward him.  In fact, upon information and belief, two senior white female professors were eventually disciplined by the then Dean of SMTD for harassing Professor Mukherji.  But given his broader support in the faculty, Professor Mukherji decided to remain at the SMTD.

**University of Michigan tenure policies**

15.     The University, like most public universities, has established, written policies governing the tenure process and the granting of tenure.

16.     Under the University's Bylaws, the Regents are the ultimate body that grants tenure.  But the Regents' decision to grant tenure is essentially a ratification of the "recommendation" of the chair of the department, the dean, and the executive committee of the school or college within the University in which a professor is seeking tenure, as well as the recommendation of the Provost of the University based on the recommendation of the chair, dean, and executive committee of the school or

4

college.

17.     The written tenure policies of the University as well as SMTD carefully delineate the role of each individual or entity in the tenure process and in the ultimate decision about whether to grant tenure to a professor.  These tenure policies were adopted in part because prior tenure and promotion processes were deemed to lack institutional consistency such that the University was an outlier among its peer institutions.

18.     The Provost's role in the University tenure process is one of "administrative supervision" of the Bylaws.  In this regard, the Provost is responsible for establishing an "institution-wide set of norms and expectations" and "common principles" including "University requirements" and "'best practices'" with which school and colleges must comply in creating their specific tenure criteria and processes.

19.     Substantively, the Provost's administrative review involves the Provost's examination of each faculty's casebook to ensure that it complies with the broader University norms and expectations.  But because the Provost is incapable of assessing the actual substantive merits of the majority of tenure cases that come before her (because they originate from "many different units and disciplines" – for example, a Provost who is an economics professor would be unable to assess the substantive merit of the tenure case of candidate from a different field – *e.g.,*

mathematics, physics, art, dance or music theory), the Provost requires the subject matter expert – the Dean or Director of a school or college - to submit an "accurate, thorough, and balanced summary of the casebook and the promotion review in the unit," including the "substantive impact the faculty member's research or scholarly work has had either within their own field(s) or more broadly," as well as the "contributions to interdisciplinary teaching."   The Provost relies on the Dean or Director letter to assess the overall merits of the candidate's case.

20.    Also, because of the limited expertise of the Provost, the University's tenure policies require that in "reviewing both negative and positive recommendations for tenure and promotion, the Provost/EVPAA may accept the recommendation" or in the case the Provost disagrees with the recommendation, "send the case back to the school or college for reconsideration."

21.    The University maintains comprehensive written tenure polices that it publishes and encourages its faculty and prospective faculty to read and review.  This is consistent with norms and expectations of the University for "[t]ransparency in the promotion/tenure review process," including "[c]lear and comprehensive, written procedures and standards for promotion and evaluation" and "[e]xplicit safeguards to ensure consistency in the evaluation process at each level of review for all individuals" so that everyone involved knows that "they must act in good faith and they must conform to institutional and unit requirements."   The norms and

expectations also mandate that schools "establish written criteria for promotion and tenure evaluation and make them available to all untenured faculty."

22.    In the case of a negative tenure decision, the "dean or provost or a duly authorized elected or appointed faculty committee may, where consistent with the policies of the University and the school or college, decide that a second review is appropriate and the tenure decision should be deferred."

**Professor Mukherji is promoted for tenure by his department, SMTD, and his academic peers.**

23.    During his time as an Assistant Professor, Professor Mukherji continued to excel.  He received positive reviews related to his research and teachings, and was, for example, the recipient of a Michigan Institute for Data Science Music Challenge Initiative Grant, as well as an MCubed 3.0 Academic Innovation Mini-Cube Grant.

24.    Professor Mukherji has written and published a number of articles and books.  His reviews from students are almost universally positive.  And he has engaged in substantial service activities, including becoming the Chair of Race and Ethnicity for the Society of Music Theory, the most prominent organization in the field of Music Theory.

25.    Among Professor Mukherji's mentors is Noam Chomsky, who has described Professor Mukherji's work as "imaginative, perceptive, highly original, well-argued and quite impressive in scope and solid grounding in several areas."

26.     On April 12, 2016, Professor Mukherji received his third-year review by SMTD's Executive Committee.  Not surprisingly, the review self-describes itself as "a positive one."  It noted that Professor Mukherji was a "successful and popular teacher of a wide variety of challenging courses at both the undergraduate and graduate level."  It stated that the "Committee was satisfied with the scholarly projects" that he had "brought to completion."  It did note that Professor Mukherji's CV included an unusual amount of "'work in progress'" and that it would be "critical for [Professor Mukherji] to focus [his] research, to ready a book for submission, and to complete several more articles."  The review also noted that Professor Mukherji's "level of service [was] meaningful and appropriate at this state in [his] career."  It also noted that Professor Mukherji had "strong support from [his] departmental colleagues," and that he had "established good professional relationships with [his] colleagues in the profession and in the School," and lauded the fact that he had "devoted a generous amount of time and energy to the university, school and department."  The letter noted that the Executive Committee was "scheduled to conduct [his] promotion and tenure review during the sixth year of [his] appointment."  The review referred Professor Mukherji to the faculty handbook again to "help" him "plan for this future endeavor."

27.     In 2019, Professor Mukherji received the support of the Chair of the Music Theory department to have his tenure case considered by SMTD.  Professor

Mukherji worked with his Chair to create his dossier and other tenure materials, and to create a list of external reviewers.

28.     On December 12, 2019, the Executive Committee of SMTD considered and recommended that Professor Mukherji's tenure case be advanced to the Provost for approval.   Professor Mukherji was deemed to have a "broad-ranging and ambitious research agenda," "an international reputation in the field," an unusually "interdisciplinary and collaborative disposition" for a music theorist, a "scholarly productivity" that met the "criteria for tenure," and was considered a "promising, highly productive and well-regarded early-career scholar, whose broad and innovative research agenda is emergent."

29.     Also, although when Professor Mukherji's tenure case was initially considered by external reviewers and submitted to the Provost's office, some of his publications were still in process, by February 12, 2020 when the Dean of SMTD submitted his letter of support in anticipation of the Provost's conducting of her administrative review, a "substantial update to his publication record" had taken place with an additional "three peer-reviewed journal articles, a conference paper, and a book chapter hav[ing] been accepted for publication," and a "second book under contract . . . . ."  The Dean's letter, which speaks both in an objective manner and at length about Professor Mukherji's tenure case, whole-heartedly recommended that Professor Mukherji be granted tenure.

30.    In April of 2020, the Provost considered Professor Mukherji's tenure case.  In Professor Mukherji's case, the task of conducting the administrative review was delegated to Vice Provost Sara Blair, a Professor of English Literature.

**The Vice Provost implements a tenure review process that caused Professor Mukherji to be subjected to different standards, and permitted individuals with discriminatory and retaliatory motives to negatively affect his tenure decision.**

31.    But rather than conduct an administrative review of the tenure case, the Provost (through Vice Provost Blair) has disclosed that she actually decided to conduct an initial substantive review, and a second, substantive tenure review both in violation of the University's tenure policies.

32.    The Provost's initial substantive review is inconsistent with her role in the tenure process and her required reliance on the Dean's letter, and her secret, second review, lacked all of the procedural safeguards and checks and balances that are present in the University's official tenure policies that the University openly states are necessary to ensure that tenure reviews are consistent with norms and expectations and integrity in the tenure process.

33.    Ultimately, upon information and belief, the Provost's failure to follow the written tenure procedures of the University caused her to solicit information from an internal faculty who had a discriminatory motive, and was part of a group of white professors that had been advancing an agenda promoting white faculty above their minority colleagues, that marginalized minority faculty in the department, and that

sought to prioritize the hiring of white faculty, particularly, white women over minority candidates, including minority women and men.

34.     Upon information and belief, the review also likely involved a second faculty member of the Music Theory department who had previously been disciplined by SMTD for harassing Professor Mukherji.

35.     During the course of the second review, Professor Mukherji became concerned about the treatment of his tenure case, and asked the University's Office of Institutional Equity ("OIE") to investigate.  OIE terminated its investigation after several key witnesses named by Professor Mukherji declined to participate because of their own concerns that they themselves might be subject to retaliation by the University.

36.     Because of the arbitrary nature of the Provost's second review process, the Provost has subjected Professor Mukherji to a discriminatory tenure decision. Upon information and belief, in the recent past, a white female faculty member in the Music Theory Department was also subject to this second review process.  But unlike Professor Mukherji, this white female faculty member had a University advocate that worked with the Provost's office to create a favorable review process by which the white female faculty member was given specific guidance about what she would need to do to obtain a favorable decision, and additional time in which to accomplish the objectives, including additional time to improve her publication

record (a benefit not provided to Professor Mukherji) and otherwise alter the tenure process in ways that were to her benefit.

37.     In addition, via the second review process, the Provost has also subjected Professor Mukherji to different and more strict standards than other white faculty members in the Music Theory department who have been granted tenure.

38.     The Provost decided not to recommend Professor Mukherji's tenure case on or about July 29, 2020.   Notably, despite tenure policies requiring transparency in the tenure process, the Provost refused to discuss or disclose information regarding the second review process (or that it even occurred) or the reasons for her decision.

39.     On October 20, 2020, Professor Mukherji and his former department Chair wrote a joint letter to the University of Michigan Board of Regents specifically detailing the improper actions of the Provost with regard to Professor Mukherji's tenure case.   The Board of Regents failed to take any actions.

**<u>Professor Mukherji files and wins his grievance proceeding.</u>**

40.     On October 26, 2020, Professor Mukherji filed a grievance with the University regarding the handling of his tenure case.   University procedures permit individuals to file grievances for actions that "violate[] University policy" or are otherwise "manifestly unfair."

41.     Professor Mukherji raised a number of procedural violations in the University's handling of his tenure case.

42.     During the course of the grievance procedure, the Provost's office indicated that one of the reasons why it denied Professor Mukherji's tenure case was because the Music Theory department Chair had mentioned in his letter of support, the fact that Professor Mukherji had succeeded despite being subject to racial discrimination in the department.  Professor Mukherji had discussed these issues with his Chair on several occasions (and his Chair had indicated that he had also observed similar concerning conduct on behalf of the individuals in question). Rather than be concerned by or investigate these allegations, upon information and belief, the Provost disregarded them, and took umbrage at them.  In fact, the Provost effectively penalized Professor Mukherji's tenure case because of these allegations, and upon information and belief excluded Professor Mukherji and his Chair from the second review because of them.

43.     On July 17, 2021, the grievance panel issued a decision in which it held that the Provost's secret tenure review violated the University tenure policies and was "manifestly unfair."  It also raised concerns that the decision was racially discriminatory:

> the limited scope and lack of oversight of the Provost's additional review may have included and may have potentially allowed a faculty member **with a demonstrated racial bias** to sidestep the process at the Unit level, and instead, enter the process directly at the Provost level.

At the Unit level, this faculty member would most likely have been more comprehensively vetted and possibly excluded from the process. At the Provost level, due to lack of scope and specialization, the faculty member's involvement may have carried undue weight in the overall process.

44.     Among other remedies, the panel recommended that the Provost provide a second administrative review of Professor Mukherji's tenure case with the oversight of the University Faculty Senate Director and a committee of representatives from the Faculty Senate Advisory Committee on University Affairs ("SACUA").

45.     Despite this formal finding and the Provost's direct awareness of it and the potential of racial discrimination in the process, the University failed to take any steps to investigate Professor Mukherji's tenure case.

**The Provost retaliatorily overturns the faculty panel decision despite her clear conflict of interest and lack of authority to do so.**

46.     Neither party appealed the grievance panel decision.  Thus, under the University grievance policy, the decision became final.  The Provost was required to ensure enforcement of the grievance decision.  The Provost refused to do so.

47.     Instead, the Provost *sua sponte* overturned the decision despite lacking the power to do so and despite her clear conflict of interest. The University subsequently failed to take any of the actions recommended by the grievance panel and terminated the employment of Professor Mukherji on May 31, 2021.

48.    Professor Mukherji filed a charge of discrimination with the EEOC on or about May 20, 2021.

49.    The EEOC issued Professor Mukherji a right-to-sue letter on May 24, 2023.

## COUNT I
## TITLE VII - RACE DISCRIMINATION

50.    Plaintiff hereby incorporates all preceding paragraphs.

51.    Plaintiff is a minority male.

52.    During his employment with the University, Plaintiff experienced an adverse employment action based in part on discrimination on the basis of his race. Absent such discriminatory conduct, the University would not have taken the adverse employment action.

53.    The race discrimination was intentional.

54.    Plaintiff was also subject to an arbitrary process that had a differential impact on him based upon his race.

55.    Plaintiff reported the discriminatory actions to the University, but the University failed to take any actions to prevent the discriminatory actions.

56.    As a result of the University's conduct Plaintiff was harmed and continues to be harmed.

## COUNT II
## TITLE VII – RETALIATION

57.   Plaintiff hereby incorporates all preceding paragraphs.

58.   Plaintiff engaged in protected conduct when he complained of race discrimination to the University.

59.   The Provost and University were aware of his complaints.  Plaintiff has also reported the retaliatory actions to the University, but the University failed to take any actions to remedy them.

60.   The Provost and University took adverse actions against Plaintiff because of his protected complaints of discrimination as described above.

61.   Plaintiff's protected conduct motivated the retaliation.

62.   The retaliation against Plaintiff was intentional and/or was with reckless indifference to Plaintiff's rights.

63.   As a result of Defendants' conduct, Plaintiff was harmed and continues to be harmed.

## RELIEF REQUESTED

WHEREFORE, Plaintiff requests that the Court enter judgment against Defendants as follows:

a.  economic and non-economic damages;

b.  emotional distress damages;

c. reinstatement and the granting of tenure or, in the alternative, reinstatement and the granting of the second supervised tenure review ordered by the Faculty Grievance Committee;

d. attorney fees and costs;

e. punitive damages; and

f. all other legal and equitable relief determined by the Court to be appropriate.

Respectfully submitted,
SALVATORE PRESCOTT
PORTER & PORTER, PLLC

/s/ Hideaki Sano
Hideaki Sano (P61877)
Attorneys for Plaintiff Somangshu Mukherji
105 East Main Street
Northville, MI 48167
(248) 679-8711
sano@sppplaw.com

Dated: August 22, 2023

**<u>JURY DEMAND</u>**

Plaintiff demands a trial by jury in the above-captioned matter.

Respectfully submitted,
SALVATORE PRESCOTT
PORTER & PORTER, PLLC

/s/ Hideaki Sano
Hideaki Sano (P61877)
Attorneys for Plaintiff Somangshu Mukherji
105 East Main Street
Northville, MI 48167
(248) 679-8711
sano@sppplaw.com

Dated:  August 22, 2023